**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| WILLIAM LEON BRAY, | ) | CASE NO. 1:18CV02105 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| ANDREW SAUL, | ) | |
| Commissioner | ) | |
| of Social Security, | ) | **MEMORANDUM OF OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

Plaintiff, William Leon Bray ("Plaintiff" or "Bray"), challenges the final decision of

Defendant, Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying his

applications for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under

Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act"). This

Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to

28 U.S.C. § 636(c)(2). For the reasons set forth below, the Commissioner's final decision is

AFFIRMED.

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

1

# I. PROCEDURAL HISTORY

In October 2015, Bray filed an application for POD and DIB alleging a disability onset date of January 1, 2012 and claiming he was disabled due to heart failure, emphysema, and chronic obstructive pulmonary disease ("COPD"). (Transcript ("Tr.") at 152, 202.) The applications were denied initially and upon reconsideration, and Bray requested a hearing before an administrative law judge ("ALJ"). (Tr. 97, 104, 111.)

On September 13, 2017, an ALJ held a hearing, during which Bray, represented by counsel, and an impartial vocational expert ("VE") testified. (Tr. 29.) On February 22, 2018, the ALJ issued a written decision finding Bray was not disabled. (Tr. 12-28.) The ALJ's decision became final on July 19, 2018, when the Appeals Council declined further review. (Tr. 1.)

On September 13, 2018, Bray filed his Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 17, 19.) Bray asserts the following assignment of error:

(1)     Whether the ALJ's RFC finding is supported by substantial evidence.

(Doc. No. 17.)

# II. EVIDENCE

## A.     Personal and Vocational Evidence

Bray was born in February 1962 and was 55 years-old at the time of his administrative hearing, making him a "person of advanced age" under social security regulations. (Tr. 63.) *See* 20 C.F.R. §§ 404.1563(e). He has a high school education and is able to communicate in

English. (Tr. 75.) He has past relevant work as a household appliance sales person and a retail store manager. (Tr. 23.)

## B. Relevant Medical Evidence[2]

On July 3, 2012, Bray visited primary care physician Mary K. Lane, M.D. for a new patient visit. (Tr. 288.) He described poor concentration and forgetfulness, dating back to the time of his congestive heart failure diagnosis in 2005. (*Id.*) He denied depression or anxiety. (*Id.*) Bray reported a history of an ICD implant in October 2005 and described dyspnea on exertion during hot days and increased fatigue. (*Id.*) On examination, Bray displayed no lower extremity edema, a normal gait, intact sensation, and full motor strength. (Tr. 290.) His affect was appropriate. (*Id.*) Dr. Lane concluded the cause of Bray's concentration problems was unclear, noting he displayed no neurological deficits on examination. (*Id.*) She observed they were possibly related to his congestive heart failure and ordered labwork to check Bray's B12 levels. (*Id.*)

On July 20, 2012, Bray underwent a transthoracic echocardiogram, which revealed the following: (1) mildly globally reduced left ventricular systolic function; (2) a left ventricular ejection fraction of 45%; (3) no hemodynamically significant valve disease; and (4) normal diastolic LV function. (Tr. 310.)

Bray consulted with cardiologist Diyana Gunawardena, M.D., on August 1, 2012. (Tr. 309.) Bray reported his history of congestive heart failure and ICD placement, relaying his left ventricular ejection fraction had been as low as 5% in the past. (*Id.*) He denied any current

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

medications, including a beta blocker. (*Id.*) On examination, Bray had a normal gait and no motor deficits. (Tr. 312.) Dr. Gunawardena assessed Bray as being in class one of the New York Heart Associational Functional Classification and diagnosed heart failure with LV systolic dysfunction. (Tr. 313.) She prescribed Toprol and advised Bray to return in a month. (*Id.*)

Bray returned to Dr Lane on August 7, 2012. (Tr. 319.) He indicated his poor concentration had resolved after he reduced his work schedule to two days a week. (*Id.*) He reported working in an electronics department, where there was "gas burn off" from the new electronics. (*Id.*) Bray relayed his co-workers complained of syncope and migraines. (*Id.*) Dr. Lane assessed Bray's concentration deficits as "resolved," noting it was possibly related to stress or occupational exposure. (Tr. 320.)

On February 16, 2016, Bray visited primary care physician Matthew Baltes, D.O. (Tr. 493.) He reported he was recently told at a "disability exam" he had aphasia. (*Id.*) Bray indicated he had been having difficulty "finding the right words" for the past 10 years and experiencing worsening memory issues. (*Id.*) He requested a referral to a neurologist, which Dr. Baltes provided. (Tr. 493, 494.)

Bray consulted with neurologist Marc D. Winkelman on March 8, 2016, reporting aphasia and dementia. (Tr. 536.) He described difficulty at work and keeping his train of thought. (*Id.*) He indicated he had been having trouble finding words since his chronic heart failure diagnosis. (*Id.*) Bray reported incidents of locking his keys in his car, locking himself out of his home, and difficulty making decisions when stressed. (*Id.*) He indicated he did "OK" at his job, and while his short-term memory was poor, his long term memory was fine. (*Id.*)

Dr. Winkelman conducted a mini mental status examination and Bray obtained as score of 30/30. (Tr. 538.) Bray displayed no aphasia on examination and his motor tone, bulk, power, and coordination were all satisfactory. (*Id.*) Dr. Winkelman observed while Bray felt he had anomia since 2005, there was no anomia on examination. (Tr. 539.) Dr. Winkelman further noted while Bray reported short term memory deficits, his mini mental status examination was normal and he was able to do his job. (*Id.*) Dr. Winkelman concluded Bray's symptoms were likely due to a psychological issue, such as an anxiety, rather than a neurological problem. (*Id.*) Dr. Winkelman ordered a CT head scan. (*Id.*)

A March 22, 2016 CT head scan revealed no acute intracranial abnormalities, but an old infarction in the left caudate nucleus and compensatory enlargement of the left frontal horn. (Tr. 576, 579.) There was no lesion or hemorrhage. (Tr. 576.)

Bray followed up with Dr. Winkelman on April 12, 2016. (Tr. 579.) He reported his symptoms were worse in the fall and improved in the spring. (*Id.*) He indicated he was currently seeing a nutritional specialist and had started an iron supplement. (*Id.*) Dr. Winkelman reviewed the head CT scan and determined Bray had likely suffered a stroke when his "LVEF was low many [years] ago." (*Id.*) The doctor concluded "maybe [Bray's] initial [symptoms] (aphasia) were due to that stroke, but he has no neurological findings of it now." (*Id.*)

## C.   State Agency Reports

### 1.   Mental Impairments

On January 4, 2016, Bray underwent a consultative psychological evaluation with psychologist Deborah Koricke, Ph.D. (Tr. 281-286.) He reported he "had to eventually stop working full time because of his physical health issues." (Tr. 282.) He described congestive

heart failure, COPD, and emphysema.  (*Id.*)  He denied ever receiving treatment from a mental health professional, but reported anxiety, depression, and worry.  (*Id.*)

During the evaluation, Bray had "mild to moderate difficulties maintaining his focus and attention to the conversation at hand," but he "was able to express himself in fairly articulate terms" and had "no difficulty understanding questions or instructions, including complex or multi-step instructions."  (Tr. 283.)  He had no difficulty recalling his history, but he did struggle to stay focused and would lose his train of thought.  (*Id.*)  Dr. Koricke estimated Bray was functioning within the average range of intelligence, but noted Bray "became confused with the concept" of performing serial 7's.  (Tr. 284.)

Based upon this examination, Dr. Koricke diagnosed Bray with adjustment disorder with mixed anxiety and depressed mood.  (*Id.*)  She noted Bray "exhibited some mild problems with sustained attention today for mental status tasks, but had no difficulty attending to the interview conversation."  (Tr. 285.)  Dr. Koricke then provided the following assessment of Bray:

> **1.** **The claimant's mental abilities and limitations in understanding, remembering, and carrying out instructions.**
>
> Mr. Bray had no difficulty understanding questions or instructions, including complex or multi-step instructions and he possessed adequate memory for his history.  He does not show any problems with comprehension and I estimate his IQ level to be in the average range.  While he is likely functioning within the average range of ability, his ability to remember instructions may be negatively affected by his lapses in attention.  His lapses in sustained attention may make it difficult for him to fully remember what he has been told.  William may have difficulty recalling what needs to be done in the work place to following through with completing tasks.  Mr. Bray presents with adequate understanding of real-world systems relevant to the workplace.  Vocationally, he did not report any difficulty learning specific job duties while in the workplace.

**2.** **The claimant's mental abilities and limitations in maintaining attention and concentration, persistence and pace to perform tasks and to perform multi-step tasks.**

Mr. Bray's level of attention/concentration throughout the interview was variable, and he tended to struggle to stay focused at times. He was able to perform serial 7's slowly, but after a few numbers, he became confused and lost his train of thought. He completed 6 digits forward and 3 backward, indicating mild impairment in sustained concentration. In sum, he showed some attention problems on mental status tasks today, but he attended to the conversation without difficulty. Mr. Bray reports difficulty staying on task at home because of pain and distractibility and he reports a lack of persistence due to pain, poor energy and depressed mood.

**3.** **The claimant's mental abilities and limitations in responding appropriately to supervision and to coworkers in a work setting.**

Although cooperative and polite, Mr. Bray appears depressed and anxious, feeling inadequate, worthless, and helpless. Today, William was cooperative, but was somewhat difficult to engage. He demonstrated difficulty relating to others during this examination due to his anxiety and depression. Overall, he presented as an anxious and passive individual who was rather flat emotionally. He seemed tired, worried, in pain, and was emotionally constricted. Thus rapport was difficult to establish. He presents as having limitations in [his] ability to respond to others in the work place because of his adjustment disorder.

**4.** **The claimant's mental abilities and limitations in responding appropriately to work pressures in a work setting.**

Mr. Bray is not currently in counseling. He described stressors in his life to include his inability to work, diminished quality of life, and inability to do things that were once possible for him. Exposure to work pressures may increase his depression and anxiety symptoms and he does not have effective coping skills to manage emotional outbursts. He is not looking for employment at this time due to his medical issues.

(Tr. 285-286.)

On January 19, 2016, state agency psychologist Jennifer Swain, Psy.D., reviewed Bray's

medical records and completed a Psychiatric Review Technique ("PRT"). (Tr. 68-69.) She

7

concluded Bray had (1) mild restrictions in activities of daily living; (2) moderate difficulties in maintaining social functioning; (3) moderate difficulties in maintaining concentration, persistence, and pace; and (4) no episodes of decompensation.  (Tr. 68.)  Dr. Swain also completed a Mental Residual Functional Capacity ("RFC") Assessment.  (Tr. 72-74.)  She concluded Bray was moderately limited in his ability to (1) understand, remember, and carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) work in coordination with or in proximity to others without being distracted by them; (4) make simple work-related decisions; (5) interact appropriately with the general public; (6) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (7) maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; and (8) respond appropriately to changes in the work setting.  (*Id.*)  She concluded Bray was "not significantly limited" in all other areas.  (*Id.*)  Dr. Swain explained the basis of her conclusion as follows:

> Can remember 1-5 step tasks.  Can sometimes remember more complex instructions but frequently would need reminders for complex instructions.
>
> ***
> Was noted to struggle to pay attention during the [consultative examination.] Would be able to complete simple tasks that are repetitive, do not have strict production quotas, and are not fast paced.
>
> ***
> [Claimant] is indicated to observably have psych symptoms.  Could interact superficially and sporadically with others.
>
> ***
> Would require changes to be infrequent, easily explained, and slowly implemented.

(*Id.*)

On May 5, 2016, Bray underwent a consultative examination with psychologist Herschel Pickholtz, Ed.D. (Tr. 703-713.) Bray reported he "cannot find work because he is tired and has trouble expressing himself and making decisions." (Tr. 704.) He denied affective symptoms, anxiety, and mental health treatment. (Tr. 705.) He reported he was working 15 hours a week at Office Depot, but had difficulty remembering passwords and taking orders. (Tr. 706.)

During the evaluation, Bray had "very little difficulties in terms of understanding and responding to the questions and directives presented to him." (*Id*.) His "cognitive levels of functioning generally fell within the average range with some mild difficulties noted across memory in the WMS-IV." (Tr. 707.) His ability to recall fell within the average range. (*Id*.) His IQ score was also in the average range, but Dr. Pickholtz noted there "was a real discrepancy between the responses to the WMS-IV and WAIS-IV and premorbid levels of intellectual functioning in accordance with prior levels of academic achievement and work history." (*Id*.)

Bray's WAIS-IV composite scores ranged from 100-107, placing him in the 50th to 68th percentile. (Tr. 709.) Bray's memory testing indicated scores ranging from 50 to 95, placing him in the 6th to 100th percentile. (Tr. 710.) Dr. Pickholtz observed "the scatter across subtests and index scores is suggestive of mild amnestic deterioration." (Tr. 711.) Bray's "lowest performances was noted in terms of auditory memory capacities which average scores were noted in terms of visual memory, working memory, and immediate memory." (Tr. 712.) Dr. Pickholtz diagnosed an "unspecified neurocognitive disorder which appears to be mild at worst without any behavioral disturbance." (*Id*.) Dr. Pickholtz then provided the following assessment of Bray:

1. **Describe the claimant's abilities and limitations in understanding, remembering and carrying out instructions.**

The obtained IQ fell within the average range. His overall capacities to understand, remember, and carry out instructions for work comparable to the type of work he did in the past relative to intellectual levels of functioning do not reflect any significant impairment.

2. **Describe the claimant's abilities and limitations in maintaining attention and concentration, and in maintaining persistence and pace to perform simple tasks and to perform multi-step tasks.** His capacities for attention and concentration based upon the working memory index score which fell within the average range and his scores on the WMS-IV suggest a slight impairment at worst at the present time. His pace appeared to be appropriate as well as his persistence. The impact of his current complaints relative to work functioning comparable to the type of work he did in the past represent a slight impairment at worst.

3. **Describe the claimant's abilities and limitations in responding to supervision and to coworkers in a work setting.** His capacities to relate to coworkers and others, based upon his presentation and his description of his current levels of social interaction do not reflect any significant impairment at present.

4. **Describe the claimant's abilities and limitations in responding to work pressures in a work setting.** His capacities to handle the stresses and pressures of work comparable to the type of work he did in the past and based upon his current test results and his description of his current levels of handling his daily demands and expectations and his overall capacities in terms of understanding and remembering television programming and written information and performing his avocational desires and interest suggest a slight impairment at work as long as he remains sober.

(Tr. 713.)

On May 25, 2016, state agency physician Katherine Reid, Psy.D., reviewed Bray's medical records and completed a PRT and Mental RFC Assessment. (Tr. 86-87; 91-92.) She concluded Bray had (1) mild restrictions in activities of daily living; (2) mild difficulties in maintaining social functioning; (3) moderate difficulties in maintaining concentration, persistence, and pace; and (4) no episodes of decompensation. (Tr. 86.) With respect to Bray's

10

functional limitations, Dr. Reid concluded Bray was moderately limited in his abilities to (1)

understand and remember detailed instructions; (2) carry out detailed instructions; (3) maintain

attention and concentration for extended periods; and (4) respond appropriately to changes in the

work setting.  (Tr. 91-92.)  She found Bray was "not significantly limited" in all other areas.  (*Id.*)

Dr. Reid explained the basis of her conclusion as follows:

> [Claimant] appears capable of simple to moderately complex 1-5 step tasks.
> May require reminders for more complex tasks [due to] memory difficulties.
>
> ***
> [Claimant] appears capable of performing in a work setting that does not
> require strict pace or production demands.
>
> ***
> [Claimant] appears capable of performing in a routine work setting where
> significant changes can be explained in advance.

(*Id.*)

### 2.      Physical Impairments

On December 19, 2015, state agency physician Gary Hinzman, M.D., reviewed Bray's

medical records and completed a Physical RFC Assessment.  (Tr. 70-72.)  Dr. Hinzman

determined Bray could lift and carry 20 pounds occasionally and 10 pounds frequently; stand

and/or walk for about six hours in an 8-hour workday; and sit for about six hours in an 8-hour

workday.  (Tr. 70.)  He further found Bray could frequently climb ramps and stairs, occasionally

climb ladders, ropes, or scaffolds, and frequently balance, stoop, kneel, crouch, and crawl.  (Tr.

70-71.)  Dr. Hinzman concluded Bray would need to avoid concentrated exposure to extreme

temperatures, humidity, fumes, odors, dusts, gases, and poor ventilation.  (Tr. 71.)

On May 1, 2016, state agency physician Leon D. Hughes, M.D., reviewed Bray's medical records and completed a Physical RFC Assessment. (Tr. 88-90.) He adopted the findings of Dr. Hinzman. (*Id*.)

**D.      Hearing Testimony**

During the September 13, 2017 hearing, Bray testified to the following:

- He lives with his wife. (Tr. 34.) He has a driver's license and drives. (Tr. 35.) He and his wife have a recording studio where they record music. (*Id*.) He attended college for two years but did not obtain a degree. (Tr. 37.)

- He does not have much stamina or energy. (Tr. 36.) His doctors have advised him to increase the length of his daily walks. (*Id*.)

- He has worked at Office Depot for the past three years as a print shop associate. (Tr. 37.) He works 8-12 hours a week. (Tr. 38.) He attempted to work full time, but was unable to do so because he would become forgetful and fatigued. (Tr. 45.)

- He worked at Sears as an appliance and electronics salesperson for "a number of years." (Tr. 39-40.) He also worked as a night manager at a thrift department store. (Tr. 42.)

- He has memory issues. (Tr. 46.) He has consulted with his cardiologist and neurologist to determine the source of these memory difficulties. (*Id*.) His neurologist told him he had a stroke in the past but did not think the stroke had "anything to do with my stroke like symptoms." (Tr. 47.)

- His memory problems worsen when he is tired or "flustered." (Tr. 47.) He leaves himself notes to help him remember things at work. (*Id*.) He works 3-4 days a week, and by day three or four, he is "nowhere near as effective as at the beginning of the week." (Tr. 48.) Currently, he works every other day, which he finds more manageable. (Tr. 52.)

- He has pet birds, turtles, and fish he cares for. (Tr. 50.) He does some yardwork. (*Id*.)

The VE testified Bray had past work as a photostatic machine operator (D.O.T. #976.382-022), household appliance salesperson (D.O.T. #270.357-034), and retail store manager (D.O.T. #185.167-046).  (Tr. 56-57.)  The ALJ then posed the following hypothetical question:

> This is a light exertional hypothetical with the following additional limitations.  This individual can frequently climb ramps and stairs, occasionally ladders, ropes, or scaffolds.  Can frequently balance, stoop, kneel, crouch and crawl.  This person can never work at unprotected heights. Can tolerate frequent exposure to humidity and wetness, dust, odors, fumes and pulmonary irritants, and extreme cold and extreme heat.

(Tr. 58.)

The VE testified the hypothetical individual would be able to perform all of Bray's past work.  (*Id.*)  The VE further explained the hypothetical individual would also be able to perform other representative jobs in the economy, such as cashier (D.O.T. #211.462-010), food service worker (D.O.T. #311.677-010), and sales attendant (D.O.T. #299.677-010).  (Tr. 59.)

## III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r*

13

*of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Bray was insured on his alleged disability onset date, January 1, 2012 and remained insured through December 31, 2020, his date last insured ("DLI.") (Tr. 17.) Therefore, in order to be entitled to POD and DIB, Bray must establish a continuous twelve month period of disability commencing between these dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

# IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.      The claimants meets the insured status requirements of the Social Security Act through December 31, 2020.

2.      The claimant has not engaged in substantial gainful activity since January 1, 2012, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.      The claimant has the following severe impairments: congestive heart failure (20 CFR 404.1520(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except frequently climb ramps and stairs; occasionally climb ladders, ropes, or scaffolds; frequently balance, stoop, kneel, crouch, and crawl; can never work at unprotected heights; can tolerate frequent exposure to humidity and wetness, dust, odors, fumes, pulmonary irritants, extreme cold and extreme heat.

6.      The claimant is capable of performing past relevant work as a household appliance sales person and retail store manager. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.      The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2012, through the date of this decision (20 CFR 404.1520(f)).

(Tr. 17-23.)

# V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the

15

Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.

16

Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

In his sole assignment of error, Bray asserts the ALJ's RFC finding is not supported by substantial evidence because the "ALJ inadequately considered the medical opinions of record regarding [his] mental functioning." (Doc. No. 17 at 13.) Specifically, Bray argues the memory testing results administered by consultative examiner Dr. Pickholtz "contradict the ALJ's RFC finding that" he had no mental limitations. (*Id.* at 14.) Bray contends the ALJ needed to explain this contradiction. (*Id.*) Finally, Bray argues the results of Dr. Pickholtz's memory testing

support his allegations of impairment in "attention, concentration and memory," as well as the opinions of consultative examiner Dr. Koricke and the state agency reviewing physicians. (*Id.*)

The Commissioner maintains the ALJ properly considered and weighed Dr. Pickholtz's opinion. (Doc. No. 19 at 4.) The Commissioner observes while Dr. Pickholtz's memory testing revealed "low auditory, delayed, and immediate memory scores," Dr. Pickholz "himself administered these tests, discussed these scores, and still found that [Bray] had no greater than slight functional impairment in any category." (*Id.* at 4, 5.) The Commissioner asserts Bray is attempting "to mold Dr. Pickholtz's opinion into something it is not." (*Id.* at 4.)

In formulating the RFC, ALJs "are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists." 20 C.F.R. § 404.1527(e)(2)(i)[3]. Nonetheless, because "State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified physicians, psychologists," ALJs must consider their findings and opinions. *Id.* When doing so, an ALJ "will evaluate the findings using the relevant factors[4] in paragraphs (a) through (d) of this section, such as the consultant's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations the medical or psychological consultant

---

[3]     Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date. *See* 82 Fed. Reg. 5844 (March 27, 2017).

[4]     These factors include the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision. 20 CFR §416.1527(c)(1)-(6).

provides, and any other factors relevant to the weighing of the opinions." 20 C.F.R. §

404.1527(e)(2)(ii).  Finally, an ALJ "must explain in the decision the weight given to the

opinions of a State agency medical or psychological consultant or other program physician,

psychologist, or other medical specialist" unless a treating physician's opinion has been accorded

controlling weight.  *Id.*

As noted *supra*, Bray underwent a mental consultative examination with psychologist

Herschel Pickholtz, Ed.D., on May 5, 2016.  (Tr. 703-713.)  The ALJ discussed Dr. Pickholtz's

opinion as follows:

> The undersigned also gives great weight to the opinion of consultative
> psychological examiner Herschel Pickholtz, Ed.D., who opined the
> claimant had no impairment in understanding, following instructions, and
> relating to others, and only slight impairment in concentration and work
> stress (7F).  He is a highly trained mental health provider, familiar with the
> rules and regulations of disability determinations.  He also personally
> observed and examined the claimant.  Additionally, his conclusions are
> generally supported by the objective findings in the record, which show the
> claimant seeking just minimal treatment for the condition and having
> mostly unremarkable mental status evaluations, such as being alert and
> oriented times three, normal speech, normal affect, euthymic mood,
> average memory, normal insight, normal judgment, no indication of
> hallucinations, or delusions (6F/9, 7F/4, 6, 12, 10F/3, 11F/3).

(Tr. 22.)

The Court finds the ALJ properly evaluated Dr. Pickholtz's opinion.  The ALJ discussed

Dr. Pickholtz's examination findings and expressly acknowledged his opinions regarding Bray's

mental limitations.  (Tr. 18, 22.)  The ALJ accorded "great weight" to Dr. Pickholtz's opinions

and provided several reasons for doing so.  Indeed, the ALJ recognized Dr. Pickholtz was a

mental health specialist, was familiar with the disability determination process, and had

personally examined Bray.  (Tr. 22.)  The ALJ also noted Dr. Pickholtz's conclusions were

"generally supported by the objective findings in the record" and cited to specific treatment notes to support this conclusion. (*Id.*) The ALJ also discussed and reviewed Bray's allegations of memory issues and Dr. Pickholtz's memory testing prior to weighing Dr. Pickholtz's opinion. (Tr. 18.) Procedurally, the regulations require no more for an examining, non-treating source. 20 C.F.R. § 404.1527.

Bray contends because the ALJ assigned Dr. Pickholtz's opinion "great weight," the ALJ needed to explain any deviation between Dr. Pickholtz's objective findings and the RFC. (Doc. No. 17 at 14.) Specifically, Bray focuses on the results of the WMS-IV, i.e. memory testing, administered by Dr. Pickholtz. (*Id.*) During his examination with Dr. Pickholtz, Bray obtained WMS-IV[5] scores ranging from 50 to 95, placing him in the 6th to 100th percentile. (Tr. 710.) Dr. Pickholtz reviewed this testing and specifically found the WMS-IV scores "suggest[ed] a slight impairment at worst at the present time." (Tr. 713.) Dr. Pickholtz then provided an opinion on Bray's functioning, concluding Bray had no more than slight impairment in any area. (*Id.*)

In the decision, the ALJ acknowledged Dr. Pickholtz opined Bray only had "slight" to "no impairment" in terms of mental functioning. (Tr. 22.) The ALJ accordingly found no mental limitations in the RFC. (Tr. 19.) Thus, the ALJ's characterization of Dr. Pickholtz's opinion was accurate and the RFC was consistent with Dr. Pickholtz's opinion. Even assuming, *arguendo*, the ALJ's findings deviate in some respect from Dr. Pickholtz's opinion, this alone is not grounds

---

[5]     Bray also asserts the ALJ "made no mention whatsoever about [the WMS-IV] test results." (Doc. No. 17 at 14.) This is an inaccurate reading of the ALJ decision. Indeed, the ALJ specifically noted Bray had memory testing performed, which revealed "some memory issues," but observed Dr. Pickholtz had described these memory issues as "mild." (Tr. 18.)

for reversal.  *See Dykes ex rel. Brymer v. Barnhart,* 112 Fed. App'x 463, 468 (6th Cir. 2004) ("the ALJ's failure in the present case to explain why he disregarded part of the opinion of the consultative examiner does not warrant remand.").

Bray wanted the ALJ to interpret the WMS-IV test results differently and conclude such scores resulted in mental RFC limitations.  However, the ALJ reasonably relied on Dr. Pickholtz's interpretation of these test results.  Indeed, Dr. Pickholtz administered this testing, is a trained psychologist, and personally examined Bray.  Further, it is well-established ALJs are not trained medical experts and they may not substitute their own opinion for that of a medical professional.  *Meece v. Barnhart*, 192 Fed. Appx. 456, 465 (6th Cir. 2006) ("[T]he ALJ may not substitute his own medical judgment for that of the treating physician where the opinion of the treating physician is supported by the medical evidence.").  *See also McQuin v. Comm'r of Soc. Sec.*, 2014 WL 1369674, *13 (N.D. Ohio Mar. 31, 2014)("Moreover, this Court has found that an ALJ is not qualified to translate raw medical data into functional capacity evaluations.").

Moreover, substantial evidence supports the ALJ's decision to not assess any mental limitations in Bray's RFC.  In July 2012, Bray reported poor concentration and forgetfulness to his primary care physician, Dr. Lane.  (Tr. 288.)  Dr. Lane concluded the source of Bray's concentration issues was unclear and Bray exhibited no neurological deficits.  (Tr. 290.)  In August 2012, Bray returned to Dr. Lane and reported his concentration problems had resolved after he reduced his work schedule.  (Tr. 319.)  Bray did not seek any further treatment for his alleged concentration and memory issues for several years.

In February 2016, Bray reported issues with word-finding and memory to Dr. Baltes, his primary care physician.  (Tr. 493.)  Dr. Baltes referred him to a neurologist.  (Tr. 494.) Bray then

had several visits with Dr. Winkelman, a neurologist. (Tr. 536, 579.) In March 2016, Bray reported short-term memory deficits and word-finding difficulties. (Tr. 536.) However, Bray obtained a normal score during a mini mental status examination. (Tr. 538.) He displayed no aphasia or anomia, i.e. word finding difficulty. (Tr. 538-539.) Dr. Winkelman observed while Bray reported short term memory deficits, his mini mental status examination was normal and he was able to do his job. (Tr. 539.) Dr. Winkelman ordered a CT scan, which indicated Bray likely suffered a stroke many years ago. (Tr. 576, 579.) However, Dr. Winkelman concluded "maybe [Bray's] initial [symptoms] (aphasia) were due to that stroke, but he has no neurologic findings of it now." (Tr. 579.)

There is no evidence Bray has sought any further treatment for his memory deficits. He specifically denied any mental health treatment during both of his consultative examinations. (Tr. 705, 282.) While Bray did display issues with concentration and focus during his January 2016 consultative examination, he had "very little difficulties in terms of understanding and responding to the questions and directives presented to him" during his May 2016 consultative examination. (Tr. 283, 706.) Dr. Pickholtz accordingly found slight to no limitations in any area, including the ability to maintain attention and concentration. (Tr. 713.)

Bray argues the WMS-IV test results, the opinion of consultative examiner Dr. Koricke, and the opinions of reviewing state agency physicians Drs. Swain and Reid[6] support his allegations of "impairments in attention, concentration and memory." (Doc. No. 17 at 14.) However, while Bray cites to other evidence contained in the record which he believes supports a

---

[6] While Bray cites to the opinions for Drs. Koricke, Swain, and Reid to support his argument the WMS-IV test results support mental RFC limitations, he does not advance any specific argument that the ALJ improperly considered or weighed these opinions.

finding of mental limitations in the RFC, the findings of the ALJ "are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001). Indeed, the Sixth Circuit has made clear an ALJ's decision "cannot be overturned if substantial evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). In this case, the ALJ clearly articulated his reasons for finding Bray capable of performing work as set forth in the RFC and these reasons are supported by substantial evidence. Accordingly, Bray's assertion the evidence of record warrants a different RFC assessment is without merit.

Accordingly, the Court finds the ALJ did not err in his treatment of Dr. Pickholtz's opinion and further finds the RFC is supported by substantial evidence. Bray's assignment of error is without merit and does not provide a basis for remand.

## VII.   CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**

*s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: July 12, 2019

23